No. 37,665

In the Matter of the Estate of Anna Nonnast, Deceased. JOSEPH A. NONNAST, Claimant, *Appellant,* v. EDWARD NONNAST, KATHRYN MUSBACH, LOUISE M. MUSBACH and IRENE WOODS, *Appellees.*

(211 P. 2d 106)

Opinion filed November 12, 1949.

*O. A. Wilson* and *W. J. Glass,* both of Jetmore, argued the cause, and were on the briefs for the appellant.

*Ray McCombs,* of Ness City, argued the cause, and was on the briefs for the appellees.

The opinion of the court was delivered by

ARN, J.: A claim was filed in the probate court of Ness county by a son who sought to recover from his mother's estate the value of certain cattle claimed by him to have been his property. The claim by Joseph Nonnast, appellant here, was transferred to the district court without having been heard in the probate court. The administrator did not object to the claim, but upon his failure to do so written objections thereto were filed by a brother and three sisters of claimant. The hearing was had in the district court and at the

conclusion thereof the court made one finding of fact and one conclusion of law as follows:

"The Court further finds that the evidence produced at the hearing of the claim of Joseph A. Nonnast failed to establish that he was the owner of the cattle sold by Anna Nonnast during her lifetime, and also that he was the owner of the cattle sold by the administrator after the death of Anna Nonnast as alleged in his claim filed herein.

"The Court further finds as a Conclusion of Law that the claim of Joseph A. Nonnast against the above entitled estate be and the same is hereby disallowed and that the costs of this proceeding in this court be taxed against the said Joseph A. Nonnast."

Claimant's motion to set aside both the finding and conclusion, and his motion for judgment for $3,810.57 were overruled, from which rulings he appeals.

Appellant specifies as error the overruling of the two post-trial motions, but the two propositions may well be resolved into the single question as to whether the uncontroverted evidence was sufficient to establish his claim as a matter of law. This requires a review of all the evidence germane to the question involved, and it is summarized as follows:

The claimant and appellant was one of seven children of Anna Nonnast, who died in 1947. The appellees are a son and three daughters of deceased. This appellant-claimant testified that he returned from a tour of duty in the army in 1934 and continued to stay part of the time on the farm with his mother. In 1935 his mother sold all of her cattle and claimant's brother Julius bought three cows of his own. Then in 1936 this claimant bought four head and put them on the farm. The proceeds from the milk and cream from all the cattle were used to buy groceries, make repairs, etc. Some of the cattle were sold in 1941, 1943 and 1944 and he received the proceeds from the sales. Claimant furnished feed for the cattle at various times—10 or 15 tons a year—and some ground feed. His mother did not purchase any cattle after she sold hers in 1935. There were no cattle on the place from 1935 until his mother's death except those purchased by claimant and his brother Julius, and the increase therefrom. His mother sold cattle at the Ness City livestock pavilion and claimant's exhibits 1, 2, 3 and 4 were identified as sales tickets made in his mother's name. These tickets show sales made July 5, 1945, December 5, 1945, September 26, 1946, and October 1, 1947, for a total of $2,124.97. After the death of Anna Nonnast late in 1947, the administrator took possession

of the cattle left on the place, some of which belonged to claimant's brother Julius. Julius' cattle were not sold by the administrator.

The testimony of Julius was that he lived on the farm with his mother from 1924 until March 18, 1941. In 1935, the mother sold all of her cattle and Julius bought three head of milk cows. Then in 1936 Julius went to a C. C. C. camp, and when he returned there were four other cows on the farm making a total of seven. The increases from his three cows were sold at various times and an accounting was made to him of the proceeds.

Another brother, John, testified he was at the farm home in 1936 and overheard a conversation between Joseph and his mother relative to Joseph getting some cattle on the place, if mother would furnish feed, pay taxes, and help, and she said she would. Only three head of Julius' cattle were on the place at the time. John went to the place in the spring of 1941 and deceased had no cattle of her own then. There were cattle there which Joe and Julius bought. John could then point out the ones which were Joe's. He used to keep track of the increases by writing them on the calendar. During that time he sold three red steers belonging to Joe. Joe was paid for them by the mother, Anna Nonnast. That was in 1941. After that time the mother sold some of the increase or some of the cows from Joe's part of the herd. In the spring of 1944 the mother told John to sell some of the cattle and George Roth hauled them to town. John was present when they were sold. Claimant's exhibits 1, 2, 3, and 4 were identified as sales tickets of Joe's cattle sold in his mother's name in 1945, 1946 and 1947. John received the checks and deposited them in his mother's name. At the time of the mother's death there were no cattle on the place except those belonging to Joe and Julius. Julius got his cattle after her death and sold them. Julius' cattle were not appraised by the appraisers for the estate.

The administrator Lea Maranville then testified that he, as administrator of the Anna Nonnast estate, took possession of 14 head of cattle when he was appointed. He sold them at an administrator's sale as shown on the sales sheet, claimant's exhibit 5. This sales sheet shows nine cows, one heifer and four calves having been sold on January 2, 1948, for $1,720. While at the Nonnast home with the appraisers in November, 1947, at the time of the appraisement, the cattle were exhibited to the appraisers by John Nonnast. Joe, appellant here, was present at the time of the appraisement, in

November, 1947, and no claim was made by him as to ownership of the cattle. The record shows Joseph Nonnast's petition setting forth his claim was filed in April, 1948.

Another witness, Walter Rothe, testifying for the respondents, said John Nonnast, brother of appellant, pointed out the cattle to the administrator. Joe Nonnast was present at the time. Witness Rothe further testified.

"Q. Did John point out part of the cattle as belonging to Julius and part to Joe?

"A. No, part for Julius and part for the estate.

"Q. What words did he use?

"A. He said these are Julius' —

"Q. As to any of the others, did he give you a direct statement who they belonged to—outside of these belonging to Julius?

"A. No.

Testifying for respondents, one of the appellees, Kathryn Musbach, testified she visited her mother often while John lived there. She saw cattle on the place. She knew about the time appellant bought the cattle and took them out to the place.

Another of the appellees, Louise Musbach, testified she visited her mother every Sunday and saw cattle on the place. She remembered the time that appellant bought the cattle and put them on the mother's place. They were Jerseys.

It should also be mentioned that exhibit 5, the sales sheet of the administrator's sale on January 2, 1948, shows appellant listed as the purchaser of 13 small items such as barbed wire, posts, farm machinery, etc. It was at this sale that 14 head of cattle now claimed by appellant to be his, were sold.

The foregoing testimony and the five sales sheet exhibits constitute all the evidence, and appellant contends this was sufficient to establish his claim against his mother's estate.

There is no conflict in the testimony that Joesph purchased the four head of cattle in 1936, and that in 1941, 1943 and 1944, several head of cattle were sold and his mother accounted to him for all the proceeds. With claimant having purchased the original four cows and placed them on his mother's farm as his own cattle, and having himself furnished some feed for them, and he having received from his mother the proceeds for the several head sold prior to 1945, there may be some inference that the cattle and the increase therefrom were regarded by the appellant's mother, the deceased, as belonging to this appellant-claimant. It seems to be appellant's con-

tention that such an inference follows from the uncontradicted evidence and that such inference conclusively establishes his claim against the estate.

But on the other hand, there were other matters which the trial court may have considered—for example, (1) the proceeds from the cattle sold in 1945, 1946 and 1947 were placed in the mother's bank account, and for some reason she did not see fit to account to claimant for them prior to her death; and (2) although the four head of cattle originally purchased by claimant belonged to him, that number or more was sold during 1941, 1943 and 1944, and claimant received the money for them—and the proof as to the ownership of the other cattle was not too convincing; and (3) claimant stood by at the time the appraisers were appraising the cattle for the estate in November, 1947, and made no claim that they were his, although he surely knew the purpose of appraisement was to have them sold as assets of the estate; and (4) claimant attended the administrator's sale on January 2, 1948 (some months before filing his claim), and purchased 13 items in his own name, but made no claim or complaint at that time that *his cattle* were being sold by the administrator for the benefit of the estate.

It was the function and duty of the trial court to consider all these matters in determining whether claimant had proved his claim by clear and convincing evidence. We discussed the consideration which a trial court should give to the testimony received in a case of this kind in *In re Estate of Johnson,* 155 Kan. 437, 125 P. 2d 352, where it was held:

"As the trier of the facts, it was the province and duty of the court to determine what weight and credence it would give to the testimony of the witnesses on both sides of the case. Of course, a jury or court cannot arbitrarily or capriciously refuse to consider the testimony of any witness but, on the other hand, it is not obliged to accept and give effect to evidence which, in its honest opinion, is unreliable, even though such evidence is uncontradicted. (*State, ex rel. v. Woods,* 102 Kan. 499, 170 Pac. 986; *Potts v. Mc-Donald,* 146 Kan. 366, 69 P. 2d 685; *State v. Jones,* 147 Kan. 8, 11, 75 P. 2d 230; *Briney v. Toews,* 150 Kan. 489, 494, 95 P. 2d 355, *Johnson v. Soden,* 152 Kan. 284, 103, P. 2d 812.)

"Plaintiff contends this court has frequently reversed a trial court on findings of fact where there was no evidence to support the findings made. That is true where there were affirmative findings of fact unsupported by the record. Here, however, we have a negative finding of fact—a very different thing. (*Potts v. McDonald,* supra, p. 369.) Here the court, after hearing all of the evidence, was convinced the claim should not be allowed, and so found. The court quite apparently either did not believe the testimony offered in sup-

port of plaintiff's claim or the evidence was not sufficently clear and convincing to persuade the court concerning the validity of the claim.

"Appellate courts cannot nullify a trial court's disbelief of evidence (*Kallail v. Solomon*, 146 Kan. 599, 602, 72 P. 2d 966), nor can they determine the persuasiveness of testimony which a trial court may have believed. The appearance and demeanor of a witness, which appellate courts never have the opportunity of observing and which cannot be transmitted to the cold records of this court, may be, and sometimes are, far more persuasive than positive testimony." (pp. 439-440.)

The finding of the district court that appellant's claim of ownership of the cattle had not been established by clear and convincing evidence is a finding which is justified from the evidence appearing in the record before us. Had an opposite affirmative finding been made, perhaps it could be said that it was supported by substantial evidence. There is a vast difference between the setting aside of a negative finding and an affirmative finding. The finding of which appellant here complains was a negative one. The trial court was not required to consider everything in claimant's favor as it must upon a ruling on a demurrer. In determining the justice of the claim, the trial court necessarily had to conclude what weight and credence should be given to all the evidence. The supreme court will not disturb such a negative finding where it does not appear to have been made arbitrarily and capriciously.

The judgment must be affirmed.